UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ISABELITA DYER,

        Plaintiff,                      Case No. 16-cv-12496

v.                                              Honorable Thomas L. Ludington

WAL-MART STORES, INC.,

        Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On July 1, 2016 Plaintiff Isabelita Dyer filed a complaint against Defendant Wal-Mart Stores, Inc, alleging that Defendant wrongfully terminated her employment. *See* Compl. ECF No. 1. Plaintiff claims that Defendant Wal-Mart terminated her from her position as a Deli Department Manager after she requested – but did not take – leave pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq.*. She also alleges that she was terminated from her position because of her national origin in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 200-e2(a), and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Michigan Compiled Law 37.2202(1)(a). After the close of discovery, on February 23, 2017, Defendant moved for summary judgment as to each of Plaintiff's claims. *See* Mot. Summ. J., ECF No. 6. For the reasons stated below, Defendant's motion will be granted.

**I.**

Plaintiff Isabelita Dyer was born and raised in the City of Villareal in Samar, Philippines. *See* Dyer Dep. 10, ECF No. 6-2. After moving to the United States, in 2002 Plaintiff began working for a Sam's Club location in Virginia Beach, Virginia. *Id* at 15-16. Upon moving to Michigan in 2005, she transferred to a Sam's Club location in Saginaw, Michigan. *Id*. at 24-25;

ECF No. 9-3. Plaintiff then transferred from Sam's Club to a Wal-Mart store located on Brockway Road in Saginaw, Michigan, on September 16, 2006. *See* Job Offer, ECF No. 9-4. Plaintiff initially worked as a bakery packager and cake decorator. *See* Dyer Dep. 26-27. However, in 2009 she was assigned to the position of Deli Department Manager. *Id*. at 27. Throughout her time as a Deli Manager, Plaintiff Dyer received largely solid performance reviews, but was regularly advised to work on training and building relationships with the associates in her area. *See* ECF No. 9-5.

## A.

In September of 2014, Brenda Ortega became the manager of all "Fresh" areas in the Brockway Wal-Mart, which meant that she became Plaintiff's supervisor. *See* Ortega Dep. 5-6, ECF No. 6-14. Plaintiff Dyer believed that Ms. Ortega treated her disrespectfully. In support of this assertion, Plaintiff claims that Ms. Ortega regularly informed Plaintiff that she had trouble understanding her, and made comments such as, "[s]low down Lita. I can't understand you because of your accent," or "[s]low down Lita. Take a deep breath. I can't understand you." *See* Dyer Dep. 37. Plaintiff concedes that she often spoke quickly. *Id*.

On September 26, 2014 Ms. Ortega issued Plaintiff a First Written Coaching under Wal-Mart's "Coaching for Improvement" disciplinary policy.[1] The basis for the Coaching was stated as follows: "Isabelita has had some conversations with associates that have not been interpreted as being spoken to with respect. This has occurred on several different occasions with different associates." *See* First Coaching, ECF No. 6-7. Plaintiff was advised to treat her associates with

---

[1] Defendant Wal-Mart maintains a disciplinary policy called "Coaching for Improvement", which provides for three levels of written coaching. Levels of coaching may be skipped in certain situations, and employees may only receive one of each level of coaching in any 12-month period. An employee is subject to termination if she performs her job unacceptably after having received a Third Written Coaching within the preceding 12 months.

respect, and warned that further disrespectful behavior could lead to "Second Written up to and including Termination." *Id*.

Plaintiff Dyer received a Second Written Coaching from Ms. Ortega on February 1, 2015, after Ms. Ortega discovered expired meat product in the deli. *See* Second Coaching, ECF No. 6-7. Some of the relevant sell-by dates had recently passed, but Ms. Ortega discovered Prima Deli Forest Ham in the meat case with a sell-by date of January 1, 2015, or a month before the Coaching was issued. *Id*. The Coaching advised Plaintiff to check expiration dates on a daily basis, first thing in the morning. *Id*. It also warned Plaintiff that the next level of action would be a "Third Written up to and including Termination." *Id*. Plaintiff does not dispute that expired product was discovered. Instead, Plaintiff argues that she had delegated the task of checking for expired food, as Ms. Ortega allowed her to do, and therefore was not responsible for the violations. *See* Dyer Dep. 60-61. Plaintiff concedes, however, that she was still responsible for double checking the work of her subordinates in order to ensure that they completed their assignments. *Id*. at 62.

**B.**

In April of 2014, Plaintiff informed Ms. Ortega that she would need to take FMLA leave in order to care for her husband while he recovered from surgery. *See* Ortega Dep. 16-17. Ms. Ortega referred Plaintiff to the personnel department. *Id*. On April 10, 2015 Plaintiff's request was referred to Defendant's third party claims administrator, Sedgwick. *See* ECF No. 9-11. That same day, April 10, 2015, Sedgwick sent Plaintiff a letter stating that it had received her request to take leave under the FMLA from April 17, 2015 to July 8, 2015. *See* ECF No. 9-13. The letter informed Plaintiff that her request was conditionally approved, but that a final decision could not be made until Plaintiff proved that she met certain eligibility requirements and

provided medical documentation in support of her request. *Id*. The supporting documentation was due by April 30, 2015. *Id*.

On April 16, 2015 – the day before Plaintiff's FMLA leave was scheduled to begin – Ms. Ortega directed Plaintiff Dyer to train an associate named Victoria Schaefer to perform Plaintiff's job responsibilities. *See* Dyer Dep. 112. In response, Plaintiff informed Ms. Ortega that she would not require the FMLA leave as requested. *Id*. Nevertheless, Ms. Ortega instructed Plaintiff to continue to train Ms. Schaefer. *Id*. Plaintiff testified that it made sense to have somebody trained to perform her job responsibilities for when she had days off work. *Id*. at 112-13.

After Plaintiff Dyer did not submit the required documentation, Sedgwick followed up by calling Plaintiff on May 8, 2015. Sedgwick's records reflect that a gentleman who answered the telephone stated that Plaintiff did not require any leave. *See* ECF No. 6-9 Pg. ID 243. In her deposition, Plaintiff confirmed that she ultimately did not require FMLA leave, and that her husband informed the caller from Sedgwick that she did not require the leave. *See* Dyer Dep. 109. Based on the phone call and on the fact that Plaintiff did not supply the required documentation, on May 8, 2015, Sedgwick denied Plaintiff's request for FMLA leave. *See* ECF No. 6-9 Pg. ID 250. In summary, Plaintiff did not take any leave under the FMLA, but did take a few days off under Wal-Mart's leave policy.

**C.**

A few weeks after Plaintiff returned from her leave, on May 12, 2015, Defendant received an anonymous complaint against Plaintiff via its Global Ethics hotline. *See* Barton Dec. ¶ 7, ECF No. 6-9; *See also* ECF No. 6-9 Pg. ID 215. The caller alleged that Plaintiff falsified expiration dates on food items by placing new stickers over old expired stickers, most recently

over the weekend with tapioca pudding. The caller also alleged that Plaintiff cross contaminated food and did not wash her hands after her duties. Finally, the caller alleged that Plaintiff was rude to employees, had anger management issues, and practiced favoritism. *Id*. *See also* ECF No. 6-9 Pg. ID 235. The complaint identified three deli associates who were allegedly witnesses to these acts: Ms. Schaefer, Dawn Turner, and Sache' Young (together the "Deli Associates"). *See* Barton Dec. ¶ 8.

Darrell Hudson, Co-Manager of the Brockway Road Wal-Mart location, was assigned to investigate the complaint. *Id*. at ¶ 9. He proceeded to conduct interviews of the Deli Associates and of Plaintiff's supervisor, Ms. Ortega, on May 14, 2015. ECF No. 6-9 Pg. ID 235. He also received written statements from the Deli Associates and Ms. Ortega. In her statement, Ms. Young alleged that Plaintiff treated her and her fellow associates with disrespect, and on one occasion mixed old expired macaroni with new macaroni. *See* ECF No. 6-9 Pg. ID 190. Ms. Schaefer claimed in her statement that Plaintiff had falsified the expiration dates of expired salads on May 13, 2015. *Id*. at Pg. ID 191-92. Ms. Turner's statement alleged that Plaintiff had been rude to a customer on May 12, 2015. *Id*. at Pg. ID 193-94. Finally, Ms. Ortega's statement alleged that Plaintiff had not properly checked the temperature of a chicken she was cooking on May 14, 2015. *Id*. Pg. ID 196-97.

Plaintiff Dyer, for her part, denied all of the allegations against her. In her deposition, Plaintiff testified that she had received a warning from a fellow employee, Beatrice Brown, that the Deli Associates were conspiring to get her fired. Plaintiff's allegation is partially substantiated by the deposition testimony of Ms. Brown, who testified that Ms. Schaefer and an employee named Sue told her "they was going to make up a fake statement to get [Plaintiff] out of there." *See* Brown Dep. 4, ECF No. 9-12. Specifically, Ms. Brown explained that while

Plaintiff was taking her vacation time, "Victoria was telling me that they was trying to get together to get [Plaintiff] out of there; they wanted to see [Plaintiff] go. And her and Sue was going to write up a statement, a false statement to get her out." *Id*. When asked if Victoria and Sue explained why they wanted Plaintiff to be fired, Brown testified that "they said that [Plaintiff] was kind of mean, yeah." *Id*. at 8. According to Ms. Brown, Victoria and Sue did not mention Ms. Ortega during the course of the conversation. *Id.* Ms. Brown allegedly informed Plaintiff of this plot when Plaintiff returned to work. *Id*. at p. 5-6.

Notwithstanding Plaintiff's claims of innocence, disciplinary action was recommended. Because Plaintiff already had two outstanding Written Coachings, further disciplinary action would generally have resulted in a Third Written Coaching. *See* ECF No. 6-9, Pg. ID 236. However, because the allegations against Plaintiff involved ethical issues involving food safety and inappropriate conduct, the issue was referred to Defendant's Global Ethics office. *See* ECF No. 6-9, Pg. ID 213. Ethics Manager Brandon Hudson (no relation to Darrell Hudson) then referred the investigation to Kimberly Barton, a human resource manager for Defendant. *Id.* at Pg. ID 213. On June 22, 2015, Ms. Barton emailed Darrell Hudson to inform him that Ethics Manager Brandon Hudson recommended terminating Plaintiff's employment. *See* ECF No. 6-9, Pg. ID 222. Therefore, on June 25, 2015, Darrell Hudson terminated Plaintiff's employment for gross misconduct. *Id*. at Pg. ID 232. Defendant then assigned a Caucasian employee to Plaintiff's former position. Plaintiff responded by filing the present action, arguing that she had been terminated because of her national origin and in retaliation for exercising a right under the FMLA.

**II.**

Defendant Wal-Mart now moves for summary judgment. *See* Mot. Summ. J., ECF No. 6. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (internal quotations omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52.

**A.**

Defendant first moves for summary judgment as to Plaintiff's claim of FMLA retaliation. The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id*. at § 2615(a)(2). The central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Seeger v. Cincinnati Bell Telephone Co., LLC, 681 F.3d*

*274, 282 (6th Cir. 2012)* (quoting *Edgar v. JAC Prods., Inc*., 443 F.3d 501, 508 (6th Cir. 2006)). An employer's intent is relevant because FMLA retaliation claims "impose liability on employers that act against employees *specifically because* those employees invoked their FMLA rights." *Id*. (citing Edgar, 443 F.3d at 508) (emphasis original).

**i.**

Where a plaintiff sets forth an FMLA retaliation claim based on circumstantial evidence alleging a single motive for discrimination, it is evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Plaintiff therefore has the initial burden of establishing a prima facie case of retaliation by demonstrating the following:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald,* 667 F.3d at 761.

Once a plaintiff establishes a prima facie case the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id*. at 761-62. A defendant is not required to meet this burden by a preponderance of the evidence, but rather "the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

If a Defendant satisfies this burden of production, then the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason for terminating her employment was pretextual. A plaintiff generally shows pretext by showing that the proffered reason: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds). However, as noted by the Sixth Circuit, "[t]he three-part test need not be applied rigidly. Rather, [p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Technical College*, 698 F.3d 275, 287 n.6 (6th Cir. 2012).

**ii.**

Regardless of whether Plaintiff has established a prima facie case of retaliation, Plaintiff is unable to meet her burden at the pretext stage. Even assuming Plaintiff Dyer can legally state a claim of retaliation based on a withdrawn request for FMLA leave, and even assuming Defendant had knowledge of Plaintiff's withdrawn FMLA request, Plaintiff Dyer has not presented any evidence that she was terminated in retaliation for her FMLA request. Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Specifically, Defendant alleges that Plaintiff was terminated for treating her fellow employees with disrespect and for violating Defendant's food safety policies. Plaintiff does not argue that such acts would be insufficient to warrant an adverse employment action.

Plaintiff cannot demonstrate that Defendant's proffered reasons for terminating her had no basis in fact because Defendant is protected by the "honest belief rule." The honest belief rule provides that "as long as an employer has an honest belief in its proffered nondiscriminatory

reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001). To determine whether Defendant had an honest belief that Plaintiff violated food safety procedures and was disrespectful to her fellow employees, courts must look "to whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir. 2001). In this regard, the decisional process used by the employer need not be optimal or leave "no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d at 807. "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

Plaintiff does not argue that Defendant's decisional process was insufficient or improper. And Plaintiff has presented no evidence that Defendant knew or should have known that the allegations against Plaintiff were not based in fact. Instead, the record evidence demonstrates that Defendant conducted a thorough investigation of the complaints made against Plaintiff. The investigation was led by a disinterested supervisor, Darrell Hudson, who conducted interviews, obtained written statements, and ultimately terminated Plaintiff's employment upon the recommendation of Wal-Mart's Global Ethics Department.

Plaintiff also cannot demonstrate that Defendant's proffered reason did not actually motivate the termination of her employment. To establish pretext by advancing some evidence that the proffered explanation did not actually motivate the discriminatory action, a plaintiff can "attack[] the employer's explanation by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the circumstantial evidence of discrimination makes it more likely than not that the

employer's explanation is a pretext, or coverup." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (citations and quotations omitted). To make a showing of pretext in this manner, "plaintiff may not rely simply upon his prima facie evidence but must, instead introduce additional evidence of ... discrimination." *Manzer*, 29 F.3d at 1084.

In this vein, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc*, 272 F.3d at 317. Here, temporal proximity is the only evidence Plaintiff presents in support of her FMLA retaliation claim. While Plaintiff claims that she heard a rumor that Defendant listed her position as open after she requested leave, Plaintiff has no personal knowledge that such a posting was created. *See* Dyer Dep. 111. Plaintiff also has not explained how she knew that the posting was for her specific position, and not for a deli manager position on another shift or at another store. Finally Plaintiff has not explained why such a posting would be improper. If Plaintiff had taken leave as she initially requested her position would have been open for 12 weeks, during which time Defendant would have needed to find coverage.

For the purpose of employment discrimination cases, "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 675 (6th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153 (2000)). Even if Plaintiff is correct that her termination was the result of the Deli Associates' conspiracy to bring false accusations against her, Plaintiff has presented no evidence that the Deli Associates were motivated by her request for FMLA leave. Instead, Ms. Brown's testimony reflects that Ms. Schaefer and a woman named Sue were motivated by their belief that Plaintiff "was kind of mean." *See* Brown Dep. 8. And while Plaintiff speculates that Ms. Ortega was part of the

conspiracy to have her terminated, Plaintiff has presented no evidence in support of this claim other than her own suspicions. Similarly, while Plaintiff Dyer personally believes that Ms. Ortega supplied a statement against her in retaliation for her FMLA request, a plaintiff's "feeling" that retaliation or discrimination is the cause of an adverse employment action is insufficient to show pretext; the plaintiff must offer evidence that the adverse action was actually in retaliation for specific protected conduct. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304 (6th Cir. 1989). Plaintiff Dyer's suggestion that Ms. Ortega disliked her is insufficient to demonstrate retaliation absent any evidence that Ms. Ortega disliked her – and acted to have her employment terminated – for an unlawful reason. Because Plaintiff has not met this burden, she cannot proceed on her FMLA claim.

**B.**

Defendant also moves for summary judgment on Plaintiff's claims of national origin discrimination. Title VII prohibits discrimination in employment based on the employee's national origin. *See* 42 U.S.C. § 2000e-2(a)(1). As explained by the Supreme Court, "national origin" refers to "the country where a person was born, or more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973).

**i.**

Plaintiff first argues that Ms. Ortega's statements about her accent and speaking style constitute direct evidence of national origin discrimination. "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Lautner v. Am. Tel. & Tel. Co.*, 106 F.3d 401 (6th Cir. 1997) (citations and quotations omitted). Where a plaintiff produces credible direct evidence of discrimination, "in the absence of an alternative, non-discriminatory explanation for that

evidence, there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court." *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 311–12 (6th Cir. 2001).

The alleged discriminatory nature of the Ms. Ortega's remarks requires an inference that the comments about Plaintiff's speech were actually veiled insults about Plaintiff's Filipino heritage. However, as Plaintiff Dyer's supervisor, Ms. Ortega had a legitimate interest in being able to communicate with her in English. Furthermore, because Plaintiff Dyer worked in the field of customer service, Ms. Ortega had a legitimate interest in ensuring that Plaintiff's customers could also understand her. *See Fong v. Sch. Bd. of Palm Beach Cty., Fla.*, 590 F. App'x 930, 934 (11th Cir. 2014). Because a non-discriminatory explanation for Ms. Ortega's remarks exists, the remarks do not constitute direct evidence of discrimination.

### ii.

Where there is no direct evidence of discrimination, a plaintiff may prove discrimination through circumstantial evidence using the *McDonnell Douglas* test set forth above. To establish a prima facie case of national origin discrimination, a Plaintiff must demonstrate that: "(1) [s]he is a member of a protected class; (2) [s]he was terminated; (3) [s]he was qualified for the position; and (4) [s]he was replaced by a person outside a protected class or was treated differently than a similarly situated, non-protected employee." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007). While the defendant must then come forward with a legitimate, non-discriminatory reason for the plaintiff's termination, the plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, that she was terminated because of her national origin. *Id.*

Again assuming, without deciding, that Plaintiff Dyer has established a *prima facie* case of national origin discrimination, the question becomes whether Defendant's articulated reason for firing Plaintiff was pretext for unlawful discrimination. As with her FMLA claim, Plaintiff does not argue that the conduct she was accused of would be insufficient to warrant an adverse employment action. Plaintiff is also unable to prove that Defendant's articulated reason for terminating her had no basis in fact under the honest belief rule, for the same reasons she was unable to prevail on her FMLA claim under this method. *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009).

Finally, Plaintiff is unable to meet her burden of proving that national origin discrimination actually motivated her termination. In support of her claim that she was terminated because of her national origin, Plaintiff emphasizes (1) Ms. Ortega's comments about her speech; (2) the Written Coachings Plaintiff received from Ms. Ortega; and (3) Ms. Ortega's alleged participation in the conspiracy to have Plaintiff fired. Essentially, Plaintiff argues that by submitting a written statement during the course of the investigation, Ms. Ortega infused the entire investigation with unlawful animus.

Again, Plaintiff has not presented any evidence, other than her own uncorroborated belief, that Ms. Ortega was part of a conspiracy to have her terminated. And as Plaintiff's supervisor, it was Ms. Ortega's duty to discipline Plaintiff when necessary. The fact that Plaintiff received Written Coachings from Ms. Ortega is therefore only material if the Written Coachings were motivated by unlawful discrimination. Plaintiff's entire case, therefore, hinges upon her assertion that Ms. Ortega's comments about Plaintiff's accent constitute evidence of national origin discrimination. However, Plaintiff has not alleged that Ms. Ortega mocked Plaintiff because of her accent or indicated that she was unqualified for her position because of

her accent.  Importantly, Plaintiff also has not presented evidence suggesting that Ms. Ortega's comments were motivated by bias against Plaintiff due to her Filipino heritage.  Instead, Plaintiff Dyer's own testimony is that Ms. Ortega asked Plaintiff Dyer to speak slower so that she could understand her.  Plaintiff Dyer herself acknowledged that she often spoke quickly.  The diversity of the American workplace demands that employees be allowed to seek clarity from one another without being subject to suit. Ms. Ortega's statements are therefore insufficient, without more, to "make[] it more likely than not that the employer's explanation is a pretext, or coverup." *Smith*, 220 F.3d at 759.

Moreover, Plaintiff has not presented any evidence that Defendant should be liable for Ms. Ortega's remarks under a theory of "cat's paw" liability.  It is undisputed that Ms. Ortega was not the decision-maker concerning Plaintiff's termination. Instead, Co-Manager Darrell Hudson terminated Plaintiff's employment upon the recommendation of Ethics Manager Brandon Hudson and Human Resources Manager Kimberly Barton.  In the context of a claim of antimilitary discrimination, the Supreme Court has explained that, "if a supervisor performs an act motivated by [unlawful] animus, that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *see also Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 352 (6th Cir. 2012) (applying *Staub* to a Title VII action).  Plaintiff has presented no evidence that the written statement submitted by Ms. Ortega was at all related to her difficulty in understanding Plaintiff's speech. The only allegation in the written statement supplied by Ms. Ortega was that on one occasion Plaintiff did not adequately check the temperature of a chicken she was cooking.  "An employer will not be liable for its intermediate employee's discrimination if the employer's investigation results in an

adverse action for reasons unrelated to the supervisor's original biased action." *Chattman*, 686 F.3d at 352 (citing *Staub,* 562 U.S. at 422). Because Plaintiff has not met her burden of coming forward with evidence to suggest that Wal-Mart's stated reason for terminating her was pretext for national origin discrimination, Plaintiff cannot proceed on her Title VII claim.

**C.**

Finally, Defendant moves for summary judgment as to Plaintiff Dyer's ELCRA claim. The parties agree that claims of national origin discrimination under ELCRA are analyzed under the same evidentiary standard as Title VII discrimination claims. *See Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir. 2004). Plaintiff is thus unable to proceed on her ELCRA claim for the same reasons that she is unable to proceed on her Title VII claim. Defendant's motion for summary judgment will be granted.

**III.**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 6, is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED** with prejudice.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: May 19, 2017

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 19, 2017.

s/Kelly Winslow  
KELLY WINSLOW, Case Manager